IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

|  |  |
|---|---|
| LEANNE GRABOWSKI,<br><br>                    Plaintiff,<br><br>        vs.<br><br>NANCY A. BERRYHILL, acting<br>Commissioner of Social Security;<br><br>                    Defendant. | **4:17CV3060**<br><br>**MEMORANDUM AND ORDER** |

Plaintiff Leanne Grabowski ("Grabowski"), seeks review of the decision by the defendant, Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, denying the application for claimant John Ronald Martin ("Martin") for Social Security disability insurance and benefits under Title II of the Act. See 42 U.S.C. § 1381. After carefully reviewing the record, the Commissioner's decision is affirmed.

## I.        PROCEDURAL BACKGROUND

Martin applied for Title II disability insurance benefits on June 1, 2013, claiming disability due to post traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), anxiety, depression, spinal disorders, insomnia, migraines, arthritis, and glioma. (Filing No. 12-3 at CM/ECF pp. 2–3, 12, 24). Martin's claim was denied initially on May 23, 2014. (Id. at CM/ECF p. 11), and again upon reconsideration on August 6, 2014. (Id. at CM/ECF p. 20). Martin submitted a written request for a hearing. (Id. at CM/ECF p. 24). ALJ H. Scott Williams was assigned to Martin's case and held a hearing on July 17, 2015. (Filing No. 12-2 at CM/ECF pp. 44–58). Martin was represented by Jeffrey Smith, a non-attorney representative. (Filing No. 12-3 at CM/ECF p. 24). On July 31,

2015, the ALJ issued his written decision stating Martin was not disabled. (Id. at CM/ECF pp. 24–33). On October 30, 2015, the Appeals Council remanded Martin's case for further evaluation. (Id. at CM/ECF p. 39–42).

On April 25, 2016, Plaintiff Grabowski, claimant Martin's mother, filed a notice of substitution following the death of Martin on February 17, 2016. (Filing No. 12-5 at CM/ECF p. 29). A second hearing was held on July 14, 2016. (Filing No. 12-2 at CM/ECF p. 32–43). On July 27, 2016, the ALJ issued another decision denying Martin's claim of disability. (Id. at CM/ECF pp. 14–26). Grabowski requested review of the ALJ's decision to the Appeals Council. (Id. at CM/ECF p. 2). The Appeals Council denied Grabowski's request on March 3, 2017. (Id. at CM/ECF pp. 2–5). Grabowski timely appealed the Commissioner's final decision on May 26, 2017. (Filing No. 1).

## II.     THE ALJ'S DECISION

The ALJ evaluated Martin's claim through the five-step sequential evaluation process to determine whether Johnson was disabled. As reflected in his decision, the ALJ made the following findings:

1.    The claimant met the insured status requirements of the Social Security Act through December 31, 2018.

2.    The claimant engaged in substantial gainful activity ("SGA") during the following periods: from December 2009 through May 2013 (20 CFR 404.1520(b) and 404.1571 et seq.).

3.    The claimant had the following severe impairments: residuals of infarction; restrictive lung disease; degenerative disc disease; glioma; posttraumatic stress disorder; depression; anxiety; and history of substance abuse (20 CFR 404.1520(c)).

4.  The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  The claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) except that he was limited to occasional climbing of ladders, ropes, and scaffolds; occasional stooping, kneeling, crouching, and crawling; frequent climbing of ramps and stairs and balancing; occasional exposure to unprotected heights; and continuous exposure to moving mechanical parts, operation of a motor vehicle, wetness, humidity, pulmonary irritants, extreme heat and cold. Additionally, he required a quiet environment such as an office-type setting. Mentally, the claimant was limited to simple and low-level detailed tasks. He could respond appropriately to and interact with supervisors and coworkers on an occasional basis but never with the general public. He could adapt to usual work situations and to occasional changes in the work setting.

6.  The claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on April 23, 1966, and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.  The claimant had at least a high school education and was able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled," whether or not the claimant had transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

(Filing No. 12-2 at CM/ECF pp. 16–25).

### III.    ISSUES RAISED FOR JUDICIAL REVIEW

Grabowski requests judicial review of the ALJ's decision, asserting the following arguments support the claim for reversal:

1.    The ALJ erred by failing to develop the record regarding Claimant's work activity before determining he engaged in substantial gainful activity ("SGA").

2.    The Residual Functional Capacity ("RFC") determination is not supported by substantial evidence because it is not supported by any opinion evidence and the ALJ mischaracterized the opinion of Claimant's treating psychologist.

3.    The ALJ's Step 5 determination is not supported by substantial evidence because the jobs are not consistent with the RFC determination.

(Filing No. 15-1 at CM/ECF p. 1).

### IV.    THE RECORD AND PROCEEDINGS BEFORE THE ALJ

Martin was 47-years-old when he submitted his application for benefits and was 49-years-old on the date of his death. He had completed high school and had obtained a bachelor's degree. Martin had past work experience in the Army performing logistics. Martin worked as a support services specialist for an Army recruitment command center from December 21, 2009, through May 10, 2013. (Filing No. 12-2 at CM/ECF P. 17).

In February of 2009, Martin presented at a sleep lab for evaluation of insomnia. After a sleep study in March of 2009, Martin was diagnosed with

obstructive sleep apnea and was provided a CPAP machine for treatment. ([Filing No. 13-2 at CM/ECF pp. 17, 38–39](#)).

In March of 2010, Martin was admitted to Skyline Medical Center with a headache and vision changes in his right eye. ([Filing No. 13-1 at CM/ECF p. 6](#)). Martin underwent several tests and scans to include an MRI, echocardiogram, and a pulmonary function test. When he was released, Martin was listed as having a right occipital lobe infarct, hypertension, post-traumatic stress disorder ("PTSD"), accelerated dyspnea, coronary artery disease, diastolic dysfunction, obstructive sleep apnea, chronic headaches, alcohol abuse, insomnia, depression, and night terrors. ([Id. at CM/ECF p. 6](#)).

In July of 2010, Martin was treated by Charles Clarke, M.D. for complaints of daily headaches. ([Filing No. 13-3 at CM/ECF p. 17](#)). He informed Dr. Clarke that his vision problems had resolved three weeks earlier. Dr. Clarke ordered an MRI which showed hyperintensity in the right posterior subcortical deep white matter. ([Id. at CM/ECF p. 19](#)).

Martin saw Dr. Clarke again in September of 2010 for daily headaches. ([Id. at CM/ECF p. 20](#)). An MRI revealed a lesion in the right hemisphere and which Dr. Clarke believed was a glioma. ([Id. at CM/ECF pp. 19–20](#)). Dr. Clarke referred Martin to a neurosurgeon for evaluation and treatment. Dr. Reid C. Thompson, a neurosurgeon, reported that he believed Martin had a low grade astrocytoma on his right posterior temporal lobe. He performed a biopsy. ([Id. at CM/ECF pp. 7, 22](#)). Thereafter, Martin saw Paul M. Moots, M.D., a neurooncology consult who reviewed the biopsy results and indicated he believed Marin had a glioma, but he noted that other diagnoses had not been excluded. ([Id. at CM/ECF p. 28](#)).

Martin saw Dr. Clarke again in February of 2011 for his headaches. (Id. at CM/ECF p. 29). Dr. Clarke began to suspect Martin's headaches were caused by untreated sleep apnea. (Id. at CM/ECF p. 30). Martin additionally saw Dr. Moots for his headaches in March of 2011. Through the months of February to May of 2011, these doctors attempted to change Martin's medications to alleviate his headache, and neck and back pain issues. ( Id. at CM/ECF pp. 30–35).

In July of 2011, Dr. Clarke wrote a letter stating Martin reported that standing more than 15 minutes makes him weak and exhausted, and sitting more than 30 minutes causes stiffness and pain requiring him to squat to obtain temporary relief. (Filing No. 13-2 at CM/ECF p. 74). He explained Martin's condition and treatment, and also noted Martin had degenerative arthritis, degenerative disc disease, and osteoarthritis, which were connected to his military service. (Id. at CM/ECF pp. 74–75). Dr. Clarke's letter also said Martin had extensive appointments that required him to frequently miss work.

In January of 2012, Martin began treatment with Clarkesville Pain Clinic ("CPC") presenting complaints of chronic neck and back pain, numbness in his lower back, headaches, and fatigue. (Filing No. 13-4 at CM/ECF p. 35). After a thorough examination, Martin was diagnosed with cervical syndrome, lumbago, and enthesopathy of the hip. (Id. at CM/ECF p. 37). X-rays showed multilevel degenerative disc disease and spondylosis in the lumbar and cervical spines. (Id. at CM/ECF p. 2). Through the following months, Martin continued to visit CPC with complaints of back and neck pain and he received treatment including prescriptions, injections, and lumbar medical branch blocks. (Id. at CM/ECF pp. 15–27).

During a September 2012 appointment to the CPC, Martin tested positive for opiates. (Id. at CM/ECF p. 13). He again tested positive for opiates and Oxycodone in October. (Id. at CM/ECF p. 5). Also in October, Marin reported that he had been stretching out his prescribed medication.

Martin began treatment at the Veteran's Affairs ("VA") psychology clinic in August of 2012. (Filing No. 13-5 at CM/ECF p. 63 ). It was noted that he was last seen a year earlier, and he had done well in the last year but now reported a worsening mood and depression, with anger problems. He was assessed with PTSD and mood disorder. In September, Martin complained of irritability, difficulty sleeping, and occasional nightmares and hypervigilance in crowds, but he reported the medication was helping. (Id. at CM/ECF p. 59). He was encouraged to try counseling. In December, Martin complained that he was significantly more depressed since his last visit, but he had stopped taking his medications for depression and pain. (Id. at CM/ECF p. 52). He reported nightmares, hypervigilance in groups and at work, anger, and irritability, but he stated he did not want medication. He was referred to a PTSD clinic. (Id. at CM/ECF p. 54).

In January of 2013, Martin was diagnosed with PTSD and depressive disorder. (Id. at CM/ECF p. 48). He was prescribed additional medications for anxiety and sleep and he reported he had restarted his Zoloft prescription.

In March of 2013, Martin was referred to general psychology when the PTSD clinic had concluded Martin did not meet the criteria for PTSD. (Id. at CM/ECF p. 44). Around this same time, Martin reported increased alcohol use after previously being abstinent from alcohol. (Id. at CM/ECF p. 34).

In April of 2013, Martin reported that he was fired from his job due to verbal altercations and he had sued his former employer. These events reportedly exacerbated his PTSD and depression, and Martin had difficulty trusting others. (Id. at CM/ECF p. 30). His drinking increased as well.

In August of 2013, Martin began treatment with Pennyroyal Regional ("Pennyroyal"). (Filing No. 13-6 at CM/ECF p. 3). He was diagnosed with major depressive mood disorder and PTSD, and referred for ADHD testing. (Id. at CM/ECF p. 6). In October of 2013, Martin underwent ADHD testing with Robert B. Sivley, Jr., Psy.D. (Id. at CM/ECF p. 10). Dr. Sivley noted that results of the testing were inconclusive because one of the tests indicated symptom magnification which indicated that the Martin "probably over-reported and embellished the nature and severity of his psychopathological symptoms." (Id. at CM/ECF pp. 15–16).

In July of 2013, Martin began treatment with Manoj Majmudar, M.D. for back and neck pain. He was diagnosed with lumbago, generalized neck pain, and lumbar radiculopathy. (Filing No. 13-5 at CM/ECF p. 73). Dr. Majmudar noted an MRI showed disc problems at L4-L5, but the symptoms were fairly well controlled. In August of 2013, Martin returned to Dr. Majmudar with complaints of back pain radiating into his right arm and leg. A drug test was positive for cocaine. Dr. Majmudar refused to refill Martin's Lortab prescription, and sent the drug test out for a confirmation test. (Id. at CM/ECF p. 78). Dr. Majmudar reported that an August MRI showed cervical disc disease. A September 12, 2013 examination demonstrated full range of motion, intact motor strength and sensation, and no tenderness. Martin's drug test came back positive for cocaine, so Dr. Majmudar refused to prescribe controlled substances. (Id. at CM/ECF p.

80). Martin was referred to pain management. However he did not seek further treatment for back pain until November of 2014.

In November of 2014, Martin treated with Patricia Blewett, M.D., for complaints of anxiety and back pain radiating to his buttocks. (Filing No. 13-8 at CM/ECF p. 13). A cervical MRI revealed some moderate/severe foraminal blockages. Martin reported symptoms of high irritability, anxiety, depression, insomnia, and a feeling of being watched. Dr. Blewett increased the prescribed Zoloft and referred Martin to pain management.

In November of 2014, Martin presented to Kelly Ard, CSW, seeking emergency services for alcohol and drug dependence. (Filing No. 13-9 at CM/ECF p. 2). Martin's drug use had resulted in criminal charges for DUI and simple possession. On December 2, 2014, Martin presented to Pennyroyal for drug treatment. (Id. at CM/ECF p. 22). He needed residential treatment, as he did not have the coping skills to manage recovery on an outpatient basis. (Id. at CM/ECF p. 27).

On December 2, 2014, Steven Thore, M.D., of Pennyroyal Regional MH-MR Board provided Martin with medication and outpatient mental health therapy. Martin entered a rehabilitation treatment program December 4, 2014. (Id. at CM/ECF p. 32). The therapy progress notes from Pennyroyal staff from December 4, 2014 through December 21, 2014, repeatedly state Martin had a normal affect and mood, he was cooperative and friendly, attentive, and engaged in the discussions, he had a normal appearance, and there was no alcohol or drug use. Dr. Thore noted on December 10, 2014, that Martin was improving on a recent adjustment of his medication. (Id. at CM/ECF p. 36).

Dr. Thore signed his name below the signature of a licensed social worker who completed a form in January of 2015. ([Filing No. 13-8 at CM/ECF p. 3](#)). The report stated Martin had been diagnosed with major depression, PTSD, and alcohol dependence but that his condition was stable and somewhat improved. However, Dr. Thore also stated Martin's psychiatric symptoms were too acute for him to be able to work. The form stated Martin had a current Global Assessment of Functioning ("GAF") score of 55 to 60 and Martin had a fairly good long term prognosis with his medication treatment.

In January of 2015, after having just completed a 21-day rehabilitation program for cocaine addiction, Martin attended a consultative examination with Thomas S. Dake, M.D. ([Filing No. 13-7 at CM/ECF p. 78](#)). Martin reported that he did not carry groceries, could not lift a two-year-old child three times in eight hours, does not cook or clean, cannot sit through a movie, and he does not live alone. Dr. Dake noted that Martin had obvious psychological issues and was quite tense during the examination. Dr. Dake's objective findings included a normal neurological examination and full range of motion in Martin's joints and spine. Dr. Dake diagnosed Martin with chronic anxiety and depression.

Dr. Dake also completed a Medical Source Statement regarding Martin's ability to perform work activities. ([Id. at CM/ECF pp. 84–89](#)). Dr. Dake opined Martin could lift and carry up to 50 pounds frequently; sit, stand, and/or walk a total of 7 hours each during the workday; had no limitations in using his hands or feet; could engage in various postural and environment activities on a mostly frequent basis, with some occasional limitations (climbing ladders, stooping, kneeling, crouching, and crawling) due to his mild obesity; and could perform all activities of daily living.

Nurse Practitioner Laytheater Brown saw Martin between January and May of 2015. (Filing No. 13-10 at CM/ECF p. 15). The medical records do not indicate she performed any physical examinations. (Id. at CM/ECF pp. 36–44). Another nurse completed and signed an employment capacities form for Nurse Brown after Martin's first visit on January 26, 2015. (Filing No. 13-8 at CM/ECF p. 5). This form indicated Martin could sit 6-8 hours a day, stand/walk up to 2 hours a day, frequently and occasionally lift 10 pounds, had no limitations in using his hands, and could occasionally bend, squat, kneel, climb, reach, twist, rotate, and crawl, and he needed noise restrictions due to paranoia. (Id. at CM/ECF p. 6). He was able to interact with people for up to two hours, had very little tolerance for stress, and was able to concentrate and focus for thirty minutes. The form ultimately concluded that Martin was not capable of working.

At the first hearing on Martin's claims,[1] Martin testified that he had joint aches and pains and had difficulty putting his shoes on, and his aunt, who lived with him, did all the housework, shopping, and cooking, and 75 percent of the driving. (Id. at CM/ECF pp. 47-48). He would sometimes help with the laundry, usually just getting his clothes together for his aunt. (Id. at CM/ECF p. 49). He was only able to drive thirty minutes before he would get a bad headache. (Id. at CM/ECF p. 48). He could search the internet three or four times a day, but only for half an hour at a time because he could not concentrate longer than that. (Id. at CM/ECF p. 49). He would feel paranoid around people and would only shop at convenience stores. (Id. at CM/ECF p. 50). He got three to four hours of sleep at night due to nightmares and flashbacks. (Id. at CM/ECF p. 51). He could walk three or four blocks and lift ten to fifteen pounds. (Id. at CM/ECF p. 52).

---

[1] At the second hearing, Martin's mother, Leanne Grabowski, testified that Martin passed away from choking. She was estranged from Martin and could not testify as to the Martin's symptoms and limitations. Accordingly, the ALJ relied on Martin's testimony from the first hearing in making the final determination.

At the second hearing, the VE testified that a person of Martin's age, education, and work experience, with the determined RFC, could not perform any past relevant work. The ALJ's hypothetical questioning of the VE included limitations consistent with the ALJ's RFC. The limitations in the hypothetical included working in a quiet environment such as an office setting. (Id. at CM/ECF p. 38). The VE then asked the ALJ to clarify whether he meant noise at a moderate level, and the ALJ responded it depended on the VE's definition of moderate as the ALJ was thinking an office setting. (Id.). The VE responded that there are office-type setting jobs with a noise level of quiet—level 2 and lower, and office-type setting jobs with a moderate noise level of 3. (Id. at CM/ECF p. 39).The ALJ explained he wanted the VE to list jobs with an office-type noise environment, "whether it's moderate or quiet . . . Some [offices] might be noisier than others." (Id.). In response to that hypothetical question, the VE identified the following light occupations Martin could perform: mailroom clerk, collator operator, and marker. (Id. at CM/ECF p. 40).

## V.  LEGAL ANALYSIS

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed. Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "The ALJ is in the best position to gauge

the credibility of testimony and is granted deference in that regard."
Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007). Evidence that both supports
and detracts from the Commissioner's decision must be considered, but the
decision may not be reversed merely because substantial evidence supports a
contrary outcome. Wildman v. Astrue, 596 F. 3d 959 (8th Cir. 2010). The court
should not overturn an ALJ's decision so long as it is in the "zone of choice" even
if the court disagrees with the ALJ's conclusion. Buckner v. Astrue, 646 F.3d 549,
556 (8th Cir. 2011).

Grabowski claims the court must reverse the Commissioner's decision
because the ALJ failed to develop the record regarding Claimant's work activity
before determining he engaged in SGA; the RFC was not supported by
substantial evidence; and the five-step determination was not supported by
substantial evidence because the jobs are not consistent with the RFC
determination.

1. <u>The ALJ failed to develop the record regarding Claimant's work activity
before determining he engaged in SGA.</u>

Grabowski first argues the ALJ failed to make a complete analysis of
Martin's SGA between December 2009 and May of 2013. She argues that while
based solely on the earnings, it appears that Martin engaged in SGA, the ALJ
should have taken into consideration the significant amount of time Martin
missed work and determined whether a subsidy existed. (Filing No. 15-1 at
CM/ECF pp. 14–15). Grabowski admits the ALJ's SGA findings did not actually
impact the ultimate decision because the ALJ determined Martin was not
disabled at all relevant times. (Id. at CM/ECF p. 16). Regardless, Grabowski

argues that if this court remands the ultimate decision, this issue must be resolved.

The Court does not find reversible error unless Plaintiff can prove he was harmed and the ALJ's decision would be different had such alleged error not occurred. Shinseki v. Sanders, 556 U.S. 396, 409-410 (2009) (finding "the party that 'seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.'"); Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012). Although Plaintiff admits that even had this alleged error been corrected, the ALJ's ultimate decision would not have been impacted, she still argues that Martin was harmed by the ALJ's SGA determination because it permeated his later analysis. Specifically, Grabowski argues the ALJ used Martin's work activity to assess Martin's ability to socialize in a work setting. (Filing No. 18 at CM/ECF p. 1). Nevertheless, Plaintiff does not show that the alleged error was so pervasive and harmful that but for the error, the ALJ's decision would have been different. See Shinseki, 556 U.S. at 409-410. Accordingly, this court cannot find reversible error in the ALJ's SGA determination.

## 2. The RFC Was Not Supported by Substantial Evidence.

Grabowski argues that the ALJ's RFC determination was unsupported by substantial evidence because the ALJ incorrectly considered the weight afforded to the opinions of numerous physicians and nurses and mischaracterized a statement by one physician. Specifically, Grabowski argues the ALJ provided significant weight to the consultative examiner, Dr. Dake and little weight to the treating physician Dr. Clarke, and treating nurse practitioner Brown. She additionally argues that the ALJ mischaracterized a statement from Dr. Thore.

The RFC determination is an assessment of how Plaintiff's impairments and related symptoms affect his capacity to perform work-related activities. It is, and it is solely for the ALJ to decide. Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007). The ALJ must determine a claimant's RFC "based on all relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [his] limitations." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995) (citations omitted).

Regarding Grabowski's argument that the ALJ did not afford controlling weight to the treating physicians' opinions, while a "treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007) (quoting Hogan, 239 F.3d at 961). In fact, the treating physician's opinion is due controlling weight only if the opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)).

In this case, the ALJ provided a lengthy analysis supporting his findings of Martin's RFC. (See Filing No. 12-2 at CM/ECF pp. 18–25). Where the ALJ provided little weight to certain treating physicians and nurses, his reasoning explained that inconsistencies existing either in the medical records or treating provider's own notes negated the strength of the treating provider's opinion. (See Id.). For example, the ALJ provided "light weight" to the nurse practitioner Brown's statement that Martin was limited to sedentary work because the ALJ determined these restrictions were inconsistent with the medical record after reviewing the imaging studies and record of physical examinations. (Id. at

CM/ECF p. 24). He additionally noted that the treating nurse practitioner did not complete any physical assessment of Martin to support her conclusions.

Grabowski argues the ALJ afforded too much weight to the opinions of the consulting physician, Dr. Dake, who opined that Martin could perform medium level work. However, just as the ALJ examined the record as a whole to assess the opinions of the treating providers, he did so with Dr. Dake. Although the ALJ afforded some weight to Dr. Dake's opinion, he ultimately determined that light work was more consistent with the evidence as a whole. (Id. at CM/ECF p. 23). This negates Grabowski's argument that the ALJ provided controlling or greater weight to the opinion of consulting physician, Dr. Dake.

Grabowski additionally argues the ALJ mischaracterized the statement of Dr. Thore. In the statement in question, Dr. Thore opined that Martin's psychiatric symptoms were too "acute" for him to be able to work. Regarding this statement, the ALJ stated Martin's symptoms were "too acute to determine if he was able to work." (Filing No. 12-2 at CM/ECF p. 24).

While the ALJ may have misunderstood Dr. Thore's comment, he nevertheless provided the statement some weight and provided further analysis regarding Martin's ability to work. (Id.) Additionally, the court does not find the misinterpretation of Dr. Thore's comment to be reversible error because the ultimate determination of whether a claimant is able to work is not a medical opinion, but rather an opinion on the application of the statute, a task that is assigned solely to the discretion of the Commissioner. See Brosnahan v. Barnhart, 336 F.3d 671, 676 (8th Cir. 2003).

Grabowski finally argues that the RFC determination was not supported by "any medical opinion" thus rendering it unsupported by substantial evidence. (Filing No. 18 at CM/ECF p. 3). Assuming Grabowski is arguing that the RFC is unsupported because the ALJ did not strictly adhere to the opinion of any medical professional, an ALJ does not base the RFC determination on the physician opinions, even a treating physician's opinion, but rather on the record as a whole. Grable v. Colvin, 770 F.3d 1196, 1201 (8th Cir. 2014) (holding a physician's opinion does not automatically control); Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (reasoning ALJ's RFC is not limited to medical evidence exclusively); Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) ("[a physician's opinion] does not automatically control or obviate the need to evaluate the record as whole").

While the ALJ did not strictly adhere to the expressed opinions of any one care provider, whether treating or consultative, he provided a thorough and lengthy examination and analysis of the opinions of medical professionals, assessments, records, and the claimant's own testimony when making the final RFC determination. (See Filing No. 12-2 at CM/ECF pp. 19–25). The ALJ's RFC determination was supported by substantial evidence on the record as a whole.

3. The Jobs Listed by the VE were not Consistent with the RFC Determination.

Grabowski argues that the ALJ's RFC determination limited Martin to working in a quiet work environment (such as an office-type setting with a customary range of noise), but that the job titles provided by the VE at the July 14, 2016 hearing all require "moderate" noise level under the DOT. Plaintiff

argues that the ALJ was required to elicit a reasonable explanation for the conflict before he can rely on the VE's testimony regarding these jobs.

When the ALJ reaches the fifth step of the sequential evaluation process, he has the burden of showing there are jobs in the economy that the claimant remains able to perform. The ALJ determined Martin needed "a quiet environment such as an office-type setting." (Filing No. 12-2 at CM/ECF p. 18). Later in his analysis, the ALJ reasoned "given the claimant's complaints of headaches, the undersigned finds that he was restricted to quiet work environments rather than loud noise environments." (Id. at CM/ECF p. 23).

During the July 2017 hearing, the ALJ stated that the hypothetical individual would require "a quiet work environment such as an office setting." (Filing No. 12-2 at CM/ECF p. 39). After stating the individual limitations, the VE requested clarification, and the following exchange occurred between the ALJ and VE:

> VE: Your Honor, when you say noise level, are you referring to at the moderate level?
>
> ALJ: No. Well, it -- I don't know what your definition of moderate is. I put -- I put a quiet environment, such as an office setting.
>
> VE: Okay. So you're looking at two -- okay, so we're looking at more than moderate, a noise level of two or lower, quiet.
>
> ALJ: Well, what is a -- what is a normal office-type setting?
>
> VE: Your Honor, some office settings are a 3, at the moderate level.
>
> ALJ: Okay. Well, what if –
>
> VE: That's why I need clarification.

ALJ: Okay. All right, well, I'm just saying an office-type setting, which would include the quiet and the moderate, if that's what you're saying.

VE: Okay. Okay, yes, Your Honor. There are --

ALJ: I mean there's really -- let me editorialize here. There's really no way, objectively, unless we have a decibel level. And I'm -- there's no -- nothing in the record that would enable me to give -- find any -- make any findings that he could tolerate or be around a certain decibel level of an of [sic] in work environment. So given that, the best I can do is say he could tolerate an office-type noise environment, whether it's moderate or quiet or whatever, whatever the usual customary

VE: Okay, Your Honor.

ALJ: Whatever the customary range. Some might be noisier than others. That's understandable. Okay. So –

VE: Okay.

ALJ: -- does that, does that clear it up a little bit?

VE: Yes, Your Honor.

(Filing No. 12-2 at CM/ECF pp. 38–40). Based upon this exchange, the VE then suggested the occupations of mail clerk, collator operator, and marker. (Id. at CM/ECF p. 40).


The Selected Characteristics of Occupations ("SCO"), the DOT's companion publication, provides five levels of noise. The second level is "quiet," and refers to environments like a library and many private offices. SCO, at D-2. The third level is moderate, which includes business offices in which typewriters are used. Id. Each of the jobs provided by the VE at the second hearing fit under the category of level three or moderate noise. DICOT 209.687-026, MAIL

CLERK; DICOT 208.685-010, COLLATOR OPERATOR; DICOT 209.587-034, MARKER.

Grabowski does not argue that Martin could not perform the jobs listed by the VE. Instead, she argues that the ALJ's RFC determination, which stated Martin be limited to a "quiet environment" should be literally construed to fit the definition of "quiet" as listed in the SCO, and thus the listings provided by the VE were inconsistent with the ALJ's RFC determination. And although the ALJ defined the "quiet environment" as an "office-type setting" in his RFC determination, Grabowski argues the ALJ could not have meant the SCO noise level three because "normal offices don't typically use typewriters." (Filing No. 15-1 at CM/ECF p. 19).

Based on the exchange between the ALJ and VE at the July 14, 2016 hearing, the undersigned is not convinced that the ALJ was specifically stating the office environment had to be defined as the SCO level-two "quiet" noise or lower. In fact, the ALJ explicitly stated that the office may be moderate or quiet noise level as long as the VE thought that the hypothetical office was "customary." And Grabowski's argument that a customary office cannot be moderate noise level because normal offices no longer use typewriters is misguided. Typewriters are essentially obsolete technology and are not typically used in any office. By requiring such a strict interpretation of the SCO definition of business office, almost no office could fit under the moderate/level-three noise category. Accordingly, the undersigned finds the listings provided by the VE during the second hearing meet the RFC as described by the ALJ.

For all the foregoing reasons,

IT IS ORDERED that upon review of the record as a whole, substantial evidence supports the ALJ's decision, and

1) The decision of the Commissioner of the Social Security Administration is affirmed.

    a) Plaintiff's Motion to Reverse, (filing no. 15), is denied.

    b) Defendant's Motion to Affirm, (filing no. 16), is granted.

2) Judgment in accordance with this memorandum and order will be entered by separate document.

Dated this 5th day of December, 2017.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge